1  BETSY C. MANIFOLD (182450)
   RACHELE R. BYRD (190634)
2  ALEX J. TRAMONTANO (276666)
   **WOLF HALDENSTEIN ADLER**
3    **FREEMAN & HERZ LLP**
   750 B Street, Suite 1820
4  San Diego, CA 92101
   Telephone: (619) 239-4599
5  Facsimile: (619) 234-4599
   manifold@whafh.com
6  byrd@whafh.com
   tramontano@whafh.com
7
8  *Attorneys for Plaintiff*
9  [Additional Counsel on Signature Page]
10            **UNITED STATES DISTRICT COURT**
11          **SOUTHERN DISTRICT OF CALIFORNIA**
12
   JOSHUA M. STEFFENS, Derivatively
13 on Behalf of Nominal Defendant
   MAXLINEAR, INC.,
14
15          Plaintiff,                    Case No. **'25 CV 0324 BAS AHG**
16
17          v.                            **VERIFIED SHAREHOLDER**
                                          **DERIVATIVE COMPLAINT**
18 KISHORE SEENDRIPU, THOMAS E.
   PARDUN, DANIEL A. ARTUSI,
19 CAROLYN D. BEAVER, GREGORY            **DEMAND FOR JURY TRIAL**
   P. DOUGHERTY, TSU-JAE KING
20 LIU, ALBERT J. MOYER,
   THEODORE TEWKSBURY, and
21 STEVEN G. LITCHFIELD,
22
23          Defendants,
24
      and
25
26 MAXLINEAR INC.,
27
            Nominal Defendant.
28

───────────────────────────────────────────

              VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Joshua M. Steffens ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant MaxLinear, Inc. ("MaxLinear" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding MaxLinear, legal filings, news reports, securities analysts' reports about the Company, the securities class actions *Water Island Event-Driven Fund v. MaxLinear Inc., et al.,* Case No. 3:23-cv-01607-CAB-VET (S.D. Cal.) (the *Water Island* Class Action) and *HBK Master Fund L.P. et al. v. MaxLinear, Inc. et al.,* Case No. 3:24-cv-01033-CAB-VET (S.D. Cal.) (the *HBK* Class Action and, together with the *Water Island* Class Action, the "Securities Class Actions"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of MaxLinear against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least May 5, 2023 and July 26, 2023, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2. MaxLinear is a technology company that develops and sells semiconductor solutions for the consumer and communication industries.

3. On May 5, 2022, the Company announced that it had entered into an agreement to acquire Silicon Motion Technology Corporation ("Silicon Motion"),

a Taiwan-based chip manufacturer, for $3.8 billion in cash and stock (the "Merger").

4.    In order to consummate the Merger, MaxLinear and Silicon Motion needed regulatory approval by both U.S. and Chinese agencies. Specifically, the Merger needed to be approved by the Antitrust Division of the U.S. Department of Justice, the Federal Trade Commission, and by the Chinese regulatory entity, the State Administration for Market Regulation ("SAMR"). Pursuant to the agreement (the "Merger Agreement"), regulatory approval needed to be secured by no later than August 7, 2023. The market understood that securing SAMR approval was the most significant threat to consummation of the Merger.

5.    The Merger Agreement provided that a party only had the right to terminate under very specific circumstances: (i) if the Merger failed to secure regulatory approval by the agreed-upon closing deadline; (ii) if Silicon Motion was found to be in breach of its "representations, warranties or covenants" under the Merger Agreement; or (iii) if an unexpected development had a "Material Adverse Effect" on Silicon Motion's "business, financial condition, assets, liabilities or results of operations."

6.    In the event that Silicon Motion was found to be in breach of the Merger Agreement, MaxLinear was required to provide "written notice of such breach" and to provide Silicon Motion an opportunity to cure the specified breach. Similarly, the Company was required to give Silicon Motion "prompt notice" prior to terminating the agreement due to an unexpected development which had a material adverse effect on Silicon Motion's business.

7.    Despite representations by Company management that MaxLinear was committed to closing the Merger, former employees confirm that the Company had decided internally to terminate the Merger by no later than May 5, 2023 due to a deterioration of MaxLinear's business and to macroeconomic factors.

8.    Rather than disclose this decision to the public, which would likely

lead to litigation with Silicon Motion, potentially resulting in a judicial award of specific performance against MaxLinear, Company management chose to wait and hope that the Merger would fail to secure SAMR approval, thereby freeing the Company from its contractual obligations.

9.     On July 26, 2023, however, before the market opened, SAMR threw a wrench into Company management's scheme, announcing that it had granted regulatory approval for the Merger.

10.    Hours later, the Company disclosed that it was unilaterally terminating the Merger, purportedly due to an unspecified material adverse effect on Silicon Motion's business and to unspecified breaches of the Merger Agreement by Silicon Motion. Despite Company claims that these events had occurred "as of May 5, 2023," the market viewed the timing of the announcement as suspicious, with many speculating that the reasons provided for terminating the Merger were merely pretextual.

11.    On this news, the price of MaxLinear stock declined a staggering 33.6% over the following two days, from a close of $34.00 on July 25, 2024 to a close of $22.55 on July 27, 2023.

12.    As a result of the foregoing, the Securities Class Actions were filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

13.    Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Actions, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there is complete diversity between the Plaintiff and the Defendants. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

18.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because MaxLinear is headquartered in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

***Plaintiff***

19.    Plaintiff is, and has been at all relevant times, a shareholder of MaxLinear.  Plaintiff is a citizen of Florida.

***Nominal Defendant***

20.    Nominal Defendant MaxLinear is incorporated under the laws of Delaware with its principal executive offices located at 5966 La Place Court, Suite 100, Carlsbad, California 92008. MaxLinear's common stock is traded on the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

NASDAQ Stock Market ("NASDAQ") under the ticker symbol "MXL."

***Individual Defendants***

21.    Defendant Kishore Seendripu ("Seendripu") is one of MaxLinear's co-founders and has served as its President, Chief Executive Officer ("CEO") and as Chairman of the Board since September 2003. Defendant Seendripu is named as a defendant in the Securities Class Actions. According to the Company's public filings, Defendant Seendripu received $8,935,197 in 2023 in compensation from the Company. As of March 28, 2024, Defendant Seendripu beneficially owned 5,296,531 shares of MaxLinear common stock, worth roughly $98.8 million[1] and constituting 6.4% of the Company's total outstanding shares. Upon information and belief, Defendant Seendripu is a citizen of California.

22.    Defendant Thomas E. Pardun ("Pardun") has served as a member of the Board since July 2009 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Pardun received $362,500 in 2023 in compensation from the Company. As of March 28, 2024, Defendant Pardun beneficially owned 130,872 shares of MaxLinear common stock, worth roughly $2.4 million. Upon information and belief, Defendant Pardun is a citizen of Arizona.

23.    Defendant Daniel A. Artusi ("Artusi") has served as a member of the Board since November 2018. According to the Company's public filings, Defendant Artusi received $291,853 in 2023 in compensation from the Company. As of March 28, 2024, Defendant Artusi beneficially owned 36,347 shares of MaxLinear common stock, worth $678,598. Upon information and belief, Defendant Artusi is a citizen of Texas.

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $18.67 per share closing price of MaxLinear stock on March 28, 2024.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

24.     Defendant Carolyn D. Beaver ("Beaver") has served as a member of the Board since December 2018 and serves as chairperson of the Audit Committee. According to the Company's public filings, Defendant Beaver received $310,000 in 2023 in compensation from the Company. As of March 28, 2024, Defendant Beaver beneficially owned 56,951 shares of MaxLinear common stock, worth roughly $1.1 million. Upon information and belief, Defendant Beaver is a citizen of California.

25.     Defendant Gregory P. Dougherty ("Dougherty") has served as a member of the Board since March 2020. According to the Company's public filings, Defendant Dougherty received $295,000 in 2023 in compensation from the Company. As of March 28, 2024, Defendant Dougherty beneficially owned 59,024 shares of MaxLinear common stock, worth roughly $1.1 million. Upon information and belief, Defendant Dougherty is a citizen of California.

26.     Defendant Tsu-Jae King Liu ("Liu") has served as a member of the Board since March 2021. According to the Company's public filings, Defendant Liu received $287,500 in 2023 in compensation from the Company. As of March 28, 2024, Defendant Liu beneficially owned 36,243 shares of MaxLinear common stock, worth $676,657. Upon information and belief, Defendant Liu is a citizen of California.

27.     Defendant Albert J. Moyer ("Moyer") has served as a member of the Board since October 2009 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Moyer received $299,353 in 2023 in compensation from the Company. As of March 28, 2024, Defendant Moyer beneficially owned 110,158 shares of MaxLinear common stock, worth roughly $2.1 million. Upon information and belief, Defendant Moyer is a citizen of California.

28.     Defendant Theodore Tewksbury ("Tewksbury") has served as a member of the Board since May 2015 and serves as a member of the Audit

Committee. According to the Company's public filings, Defendant Tewksbury received $308,058 in 2023 in compensation from the Company. As of March 28, 2024, Defendant Tewksbury beneficially owned 117,006 shares of MaxLinear common stock, worth roughly $2.2 million. Upon information and belief, Defendant Tewksbury is a citizen of California.

***Officer Defendant***

29.    Defendant Steven G. Litchfield ("Litchfield") has served as the Company's Chief Financial Officer ("CFO") and Chief Corporate Strategy Officer since July 2018. Defendant Litchfield is named as a defendant in the Securities Class Actions. According to the Company's public filings, Defendant Litchfield received $2,917,810 in 2023 in compensation from the Company. As of March 28, 2024, Defendant Litchfield beneficially owned 903,757 shares of MaxLinear common stock, worth roughly $16.8 million and constituting 1.1% of the Company's total outstanding shares. Upon information and belief, Defendant Litchfield is a citizen of California.

***Relevant Non-Parties***

30.    This action is based on Plaintiff's review, by counsel, of an extensive record of public documents as well as the Amended Class Action Complaint (the "Amended Complaint") in the *Water Island* Class Action which contains detailed allegations based on interviews with two former employees of MaxLinear (referred to herein as FEs 1 and 2) who provided information to plaintiffs' counsel in the *Water Island* Class Action supporting the allegations in that case. These former employees provided information on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

31.    FE 1 worked at MaxLinear as its Director of Global Trade Compliance, the Company's top compliance officer, from November 2022 until being laid off on July 18, 2023, just eight days before the expected close of the Merger. In that role,

FE 1 worked out of the Company's California offices and reported directly to MaxLinear's General Counsel and Associate General Counsel. FE 1 has more than 25 years of experience in global trade, logistics, and regulatory compliance including with respect to mergers and acquisitions.

32.    FE 2 worked at MaxLinear as a Director of Product Marketing from 2020 until December 31, 2022. FE 2 joined the Company as part of its 2020 acquisition of Intel and worked out of MaxLinear's Israel office. FE 2 reported directly to Doron Tal, MaxLinear's Vice President of Broadband Access.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33.    By reason of their positions as officers and/or directors of MaxLinear, and because of their ability to control the business and corporate affairs of MaxLinear, the Individual Defendants owed MaxLinear and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MaxLinear in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of MaxLinear and its shareholders so as to benefit all shareholders equally.

34.    Each director and officer of the Company owes to MaxLinear and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

35.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of MaxLinear, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

36.    To discharge their duties, the officers and directors of MaxLinear were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

37.    Each MaxLinear Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of MaxLinear, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

38.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

39.    To discharge their duties, the officers and directors of MaxLinear were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of MaxLinear were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of

9

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Delaware and the United States, and pursuant to MaxLinear's own Code of Ethics and Employee Conduct (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how MaxLinear conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of MaxLinear and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MaxLinear's operations would comply with all applicable laws and MaxLinear's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

40.    Each of the Individual Defendants further owed to MaxLinear and the shareholders the duty of loyalty requiring that each favor MaxLinear's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

41.    At all times relevant hereto, the Individual Defendants were the agents of each other and of MaxLinear and were at all times acting within the course and scope of such agency.

42.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MaxLinear.

## MAXLINEAR'S CODE OF CONDUCT

43.    MaxLinear's Code of Conduct begins with a message from Defendant Seendripu, which states, in pertinent part:

MaxLinear has come a long way in the two decades years [sic] since we founded this company.

* * *

While much has changed, at our core we remain the same MaxLinear that we were on the day we first opened our doors. That is because we have intentionally grown our enterprise while always looking for the

same things in each acquisition and hire: professional excellence and a steadfast commitment to doing business the MaxLinear way. We are blazing the trail to an exciting future, and we recognize the responsibility that carries. We know that how we operate and do business matters and that is why we have always conducted our business ethically, honestly and with integrity. That's the MaxLinear way.

We expect all of us at MaxLinear to bring our ethics and integrity into every interaction, transaction, or decision we make in the course of our work. We owe it to our shareholders and each other to succeed by doing business honestly and transparently. We have zero-tolerance for anything less.

44.    The Code of Conduct applies to "all directors, officers, and employees of MaxLinear and its subsidiaries or affiliates," and violations of the Code of Conduct "can result in discipline, up to and including termination."

45.    In a subsection titled "Conflicts of interest," the Code of Conduct states that "we must always execute our job functions with the Company's best interests in mind and must avoid situations where there may be an actual or perceived conflict of interest with those interests."

46.    In a subsection titled "Accuracy of records and financial integrity," the Code of Conduct states the following:

Accurate and reliable records are of critical importance in meeting legal, financial and regulatory obligations. You are responsible for creating and maintaining appropriate and accurate business records, including financial reports, expense reports, invoices, timesheets and correspondence. MaxLinear's responsibilities to our stockholders and the investing public require that all transactions be fully and accurately recorded in MaxLinear's books and records in compliance with all applicable laws. False or misleading entries, unrecorded funds, assets or liabilities, payment without appropriate supporting documentation and approval and fraudulent recordkeeping are strictly prohibited and violate MaxLinear policy and the law. Additionally, all documentation supporting a transaction should fully and accurately describe the nature

of the transaction with appropriate detail and be processed in a timely fashion.

47.    With respect to MaxLinear's corporate assets, the Code of Conduct states that "[a]t MaxLinear, we take steps to protect the Company's assets, including by [u]sing company property and information responsibly to further the Company's interests and to perform our duties."

48.    In a subsection titled "Monitoring compliance," the Code of Conduct states the following:

> Our Chief Compliance Officer, under the direction and oversight of our Audit Committee, will oversee efforts to monitor and audit compliance with this Code of Conduct. The Chief Compliance Officer also will periodically provide reports to the Board of Directors, the Audit Committee, or the Nominating and Corporate Governance Committee in this regard.

## **MAXLINEAR'S AUDIT COMMITTEE CHARTER**

49.    Pursuant to MaxLinear's Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*:

- provide oversight of the Company's (and its subsidiaries') accounting and financial reporting processes, its internal controls over financial reporting, and the audit of the Company's financial statements (including the engagement of the Company's independent registered public accounting firm);
- provide oversight of the Company's Global Ethics and Compliance Program; [and]
- assist the Board in monitoring (i) the integrity of the Company's financial statements; (ii) the Company's internal accounting and financial controls; (iii) the Company's compliance with legal and regulatory requirements; the organization and performance of the Company's internal audit function; (v) enterprise risk management and assessment, including the adequacy and effectiveness of the Company's information security policies and its internal controls regarding information security; and (vi) the independent auditor's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

qualifications, independence, and performance.

50.    The Audit Committee Charter states that the Audit Committee shall be responsible for the following:

> The Audit Committee shall discuss and, as appropriate, review with management and the independent auditors the Company's annual and quarterly financial statements and annual and quarterly reports on Forms 10-K and 10-Q, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the independent auditor's reports related to the financial statements; discuss with the independent auditors any other matters required to be discussed by PCAOB Audit Standard No. 1301, including the independent auditor's judgment with respect to the quality (and not just the acceptability) of the accounting principles applied in the Company's financial reporting, and recommend to the Board whether the audited financial statements and Management's Discussion and Analysis should be included in the Company's Form 10-K.

51.    With respect to the Company's internal controls, the Audit Committee Charter states the following:

> The Audit Committee shall discuss with management and the independent auditors significant financial reporting issues raised and judgments made in connection with the preparation of the Company's financial statements, including the review of (i) major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (ii) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues raised and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements; and (iv) the type and presentation of information to be included in earnings press releases, as

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

well as any financial information and earnings guidance to be provided to analysts and rating agencies.

\* \* \*

The Audit Committee shall review with the independent auditors, internal audit (or any third party performing an internal audit function for the Company), and management the extent to which the Company has implemented changes or improvements in financial or accounting practices or internal controls that were previously reviewed and/or approved by the Audit Committee.

\* \* \*

The Audit Committee shall review the adequacy and effectiveness of the Company's financial reporting processes and internal control policies and procedures on a regular basis, including the responsibilities, budget, and staffing of the Company's internal audit function, as well as any special audit steps adopted in light of material control deficiencies, through inquiry and discussions with the Company's independent auditors and management as well as those persons performing the Company's internal audit function. In addition, the Audit Committee shall review the reports prepared by management, and attested to by the Company's independent auditors, assessing the adequacy and effectiveness of the Company's internal controls and procedures, including any significant deficiencies in internal controls and significant changes in internal controls reported to the Audit Committee by the outside auditor or management, prior to the inclusion of such reports in the Company's periodic filings as required under SEC rules. The Audit Committee shall review disclosures regarding the Company's internal controls that are required to be included in SEC reports.

52.    With respect to the Company's risk assessment and risk management functions, the Audit Committee Charter states the following:

The Audit Committee shall approve the Company's investment policy, review and discuss quarterly reports concerning the Company's investments and financial condition, and discuss periodic management

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

reports relating to financial risk and financial risk management, including an annual report from management concerning levels of insurance coverage and risks covered.

The Audit Committee shall discuss policies with respect to risk assessment and risk management, the Company's major litigation and financial exposures, and the steps management has taken to monitor and control such exposures. In addition, the Audit Committee shall review with management the risk factors set forth in the Company's periodic SEC filings. In addition, the Audit Committee shall review regular and periodic reports by the Company's Cybersecurity Committee and management relating to the Company's information technology infrastructure, its key information technology systems, and information technology risks facing the Company (including, without limitation, cybersecurity risks and compliance with data privacy regulations).

53.    With respect to legal and regulatory compliance and compliance with the Company's Code of Conduct, the Audit Committee Charter states the following:

The Audit Committee shall establish and oversee procedures for receiving, retaining, and treating complaints received by the Company regarding accounting, internal accounting controls, auditing or federal securities law matters or violations of law or the Company's Code of Ethics and Employee Conduct (the "Code of Conduct"), and procedures for the confidential, anonymous submission by employees of concerns regarding such matters.

* * *

The Audit Committee shall provide overall oversight of the Company's Global Ethics and Compliance Program (the "E&C Program"), including ensuring that the E&C Program: (1) is well-designed; (2) is properly staffed, adequately resourced (with access to the relevant data necessary to effectively manage the E&C Program), and empowered to function effectively; and (3) is effective in practice. Through regular reports from, and discussions with the Chief Compliance Officer and/or General Counsel, the Audit Committee shall maintain knowledge of the scope, operation, and effectiveness of the E&C Program, including its

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

periodic risk assessments, and shall exercise reasonable oversight over the E&C Program's implementation and effectiveness. This shall include periodic review of the Company's policies and procedures with respect to legal and regulatory requirements, including the Code of Conduct, and risk areas including export controls, anti-corruption (including, without limitation, the Foreign Corrupt Practices Act) and compliance therewith. On an annual basis, the Audit Committee will review the implementation and effectiveness of the E&C Program with the Chief Compliance Officer, (who shall have the authority to communicate directly to the Audit Committee, promptly, about actual and alleged violations of law or the Code of Conduct, including any matters involving criminal or potential criminal conduct), and, as necessary, review benchmarking of the E&C Program against published standards from leading enforcement agencies and best practices from other leading companies.

The Audit Committee shall monitor compliance with the portions of the Code of Conduct applicable to its senior financial officers.

\* \* \*

The Audit Committee shall make regular reports to the Board, which reports shall include the Audit Committee's activities, any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the internal audit function.

## **SUBSTANTIVE ALLEGATIONS**

### *Background*

54.     MaxLinear is a technology company that develops and sells semiconductor solutions for the consumer and communication industries.

55.     Since going public in 2010, MaxLinear has focused on a strategy of growth through acquisitions. From 2015 to 2020, MaxLinear acquired five companies, with the transactions ranging in value from roughly $21 million to $472 million. MaxLinear effectuated its most substantial acquisition in 2020, acquiring

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Intel Corporation's Home Gateway Platform Division. This acquisition accounted for nearly half of MaxLinear's 2021 revenue of $890 million.

56.    On May 5, 2022, the Company announced that it had entered into an agreement to acquire Silicon Motion, a Taiwan-based chip manufacturer, for $3.8 billion in cash and stock. Specifically, pursuant to the agreement, MaxLinear paid $93.54 in cash and .388 shares of MaxLinear common stock for each Silicon Motion ADS, constituting a premium of roughly 48% above the $77.09 closing price for Silicon Motion's ADSs on the last trading day prior to public reports that it was exploring a sale.

57.    In the press release announcing the Merger, MaxLinear touted the deal as providing the Company "transformative scale," stating that it "roughly doubles MaxLinear's total addressable market opportunity to $15 billion" and that the deal would be "immediately and materially accretive" to the Company's operating income, operating margins, earnings per share, and cash flow.

58.    In order to consummate the Merger, MaxLinear and Silicon Motion needed regulatory approval by both U.S. and Chinese agencies. Specifically, the Merger needed to be approved by the Antitrust Division of the U.S. Department of Justice, the Federal Trade Commission, and by the Chinese regulatory entity, SAMR. Pursuant to the Merger Agreement, regulatory approval needed to be secured by no later than August 7, 2023.

59.    On August 31, 2022, Silicon Motion investors voted to approve the Merger. MaxLinear issued a press release following shareholder approval for the Merger, stating that "[t]he remaining requirements for closure of the transaction are customary closing conditions set forth in the Merger Agreement, including approval from the State Administration for Market Regulation (SAMR) of the People's Republic of China."

60.    While the Merger quickly secured approval by the relevant U.S. regulatory bodies, the market understood that securing SAMR approval was the

most significant threat to consummation of the Merger. Indeed, on August 31, 2022, the same day that shareholders voted to approve the Merger, SAMR notified both companies that it would not approve the deal under an expedited review; instead, the companies would have to submit a regular application for regulatory approval.

61. As trade relations between China and the U.S. deteriorated throughout 2022, investors grew increasingly concerned about securing SAMR approval. On October 7, 2022, the U.S. Government announced new limits on the sale of certain semiconductor technology to China, a rule that, as reported by the *New York Times*, was "aimed at crippling Beijing's access to critical technologies that are needed for everything from supercomputing to guiding weapons."

62. In response to the new regulation, Chinese regulators, including SAMR, began delaying reviews of several pending mergers and acquisitions involving U.S. companies. In an April 4, 2023, article titled "China's New Tech Weapon: Dragging Its Feet on Global Merger Approvals," the Wall Street Journal reported that SAMR was asking U.S. companies involved in mergers with Chinese companies to make products sold in other countries available in China in an attempt to circumvent U.S. export controls on China, specifically mentioning delays in its review of the Silicon Motion acquisition as part of China's "expanding toolbox of economic coercion" and as a means of "pressur[ing] foreign companies, and by extension, their governments."

63. Analysts reported heavily on the uncertainty of the Merger due to the need for SAMR approval, with Wells Fargo reporting on February 1, 2023 that "the proposed acq[uisition] of [Silicon Motion] remains a key focus area for investors" and that the "last step is China SAMR approval." The following day, Needham & Co. similarly reported that the "uncertainty around the [Silicon Motion] acquisition remains the biggest overhang on the [MXL] stock," stating that both MaxLinear's and Silicon Motion's "shares may be range bound" as "the two parties wait in purgatory for a deal resolution."

*Pursuant to the Merger Agreement, MaxLinear Could Not Simply Walk Away From the Deal*

64. The Merger Agreement provided that a party only had the right to terminate under very specific circumstances. Further, a party exercising its right to terminate was required to follow required specific protocols, including providing prompt notice of any claimed material breaches or material adverse effects. The Merger Agreement further imposed substantial penalties for improper termination. The circumstances under which a party could terminate in accordance with the Merger Agreement are described below.

65. First, if the Merger failed to secure regulatory approval by the agreed-upon closing deadline (the "Outside Date"), the parties could not be forced to complete the Merger. Under these circumstances, MaxLinear's liability for failing to effectuate the Merger would be capped at the $160 million break-up fee. The Merger Agreement provided an initial Outside Date of February 6, 2023, but as long as neither party breached the Merger Agreement, the date would be automatically extended twice: first to May 5, 2023 and then to August 7, 2023. If the companies failed to secure regulatory approval by August 7, 2023, then MaxLinear could terminate the agreement.

66. Second, MaxLinear had the right to terminate the deal if Silicon Motion was found to be in breach of its "representations, warranties or covenants" under the Merger Agreement. Under these circumstances, MaxLinear could avoid even paying the $160 million break-up fee. However, before terminating pursuant to this provision, MaxLinear was required to provide "written notice of such breach" and to provide Silicon Motion an opportunity to cure the specified breach within thirty days, or by the next applicable Outside Date, whichever occurred first.

67. Similarly, MaxLinear had the right to terminate in the event of an unexpected development which had a "Material Adverse Effect," or "MAE," on Silicon Motion's "business, financial condition, assets, liabilities or results of

operations." Importantly, however, MaxLinear was required to give Silicon Motion "prompt notice" of any such MAE in the event that the MAE was expected to impact the Merger.

68.    The Merger Agreement expressly excluded from the definition of an MAE the following: (i) business or economic deterioration, including changes in demand for MaxLinear or Silicon Motion's products; (ii) changes in regulatory conditions, including changes in interest rates; (iii) changes in "global or national political conditions; (iv) changes in the trading price for Silicon Motion's ADSs; or (v) "any failure by [Silicon Motion] . . . to meet any revenue, earnings or other financial projections or forecasts."

***Despite the Requirements Set Forth in the Merger Agreement and the Individual Defendants' Public Representations that MaxLinear was Committed to Closing the Merger, the Company Internally Decided to Walk Away From the Deal***

69.    Unbeknownst to the public, the Individual Defendants decided internally to terminate the Merger by no later than May 5, 2023 due to a deterioration of MaxLinear's business and to macroeconomic factors.

70.    According to former MaxLinear employees, in September 2022, just four months after the Company entered into the Merger Agreement, MaxLinear's Intel division, which accounted for roughly half of the Company's revenue, reported to senior management that it expected a 40% decline in revenue for 2023.

71.    FE 2 explained that the Intel division experienced rapid growth in 2022 as customers ordered microchips in excess of customer demand, in fear of supply chain disruptions. Accordingly, in 2023, MaxLinear's largest customers reduced their expected orders as they underwent substantial inventory destocking of MaxLinear's products.

72.    FE 1 explained that, due to the Company's reduced outlook, MaxLinear began laying off substantial amounts of employees in January 2023. As expected internally, on April 26, 2023, MaxLinear publicly reported a 15% decline

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

in revenue sequentially.

73.    In addition to the Company's inventory issues, interest rates rose substantially during the second half of 2022 and the first half of 2023, increasing the cost of financing the cash portion of the Merger. Specifically, when the Merger was initially announced on May 5, 2022, Defendant Litchfield stated that the Company expected to obtain an interest rate of the Secured Overnight Financing Rate ("SOFR Rate") "plus 2.5% to 3.5%." At that time, the SOFR Rate was .79%, but by May 5, 2023, the SOFR Rate had skyrocketed to 5.06%. Therefore, the Company expected to pay interest rates between 7.5% and 8.5% on the $3.25 billion debt it expected to incur in order to finance the Merger. This substantial rise in the interest rates increased the Company's expected interest payments by more than $140 million per year to a total annual interest cost of $250 million.

74.    As a result of these developments, former MaxLinear employees confirm that the Company internally decided to walk away from the Merger. However, as the Company was contractually obligated to consummate the Merger, the Individual Defendants elected to conceal this decision from the public. Instead, the Individual Defendants decided to wait and hope that the Merger would fail to secure SAMR approval, thereby freeing the Company from its contractual obligations. In that event, MaxLinear's liability would be capped at $160 million, significantly less than the expected ***annual*** interest payment of $250 million if the Merger was consummated.

75.    According to former employees, MaxLinear had no intention of closing the Merger, and even as late as mid-July 2023, just weeks before the Outside Date, the Individual Defendants had failed to take even the most basic steps to prepare for integration of the two companies.

76.    For instance, FE 1 observed no integration planning at MaxLinear even as late as July 18, 2023, just eight days before the Merger was terminated. For example, according to FE 1, 40% of Silicon Motion's transactions were in Chinese,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and MaxLinear lacked personnel capable of reviewing them. FE 1 stated that, despite this, MaxLinear declined to take advantage of Silicon Motion's compliance personnel that were made available to help review and translate the contracts.

77.    According to FE 1, "several key questions should have been identified, at minimum, the types of contracts, export compliance concerns— including, but not limited to, export classifications, Denied Parties screening and electronic systems and tools—what systems MaxLinear would use post-Merger, and whether MaxLinear would export all of Silicon Motion's transactions into MaxLinear's current tracking system or vice versa."

78.    FE 1 recalled suggesting to supervisors that the Company implement an "integration schedule" related to the Merger and stated that, while it is standard practice to create such a schedule at least six months prior to a merger, MaxLinear failed to do so. According to FE 1, "***there was no definitive action plan or timeline***" for the integration, which "was very bothersome to me."[2]

79.    FE 1 explained that "my expectations were based on my experience in mergers and acquisitions. We always had a list of tasks company-wide in terms of what the finance people needed to do to secure the loan, and logistics. Every single function of the company has their milestones. . . . At MaxLinear, I did not see any of this" as late as mid-July 2023. FE 1 stated unambiguously that "there was no plan and no action team in place" at MaxLinear.

80.    FE 1 continued, stating that "***there was this big acquisition supposedly on the Company's RADAR and we had not had any integration plans in place***," explaining that "based on my position as Director of Global Compliance, if [the integration plans] were in place, I would have seen them."

81.    Based on the utter lack of any integration planning, FE 1 explained that

---

[2] Unless indicated otherwise, all emphasis is added.

it was widely discussed within the company during "water cooler conversations" that the Individual Defendants had decided internally not to complete the Merger. Specifically, FE 1 stated that "it came up during a 'water cooler conversation' that *it would be more beneficial for MaxLinear to break the merger agreement and to pay a fine rather than continue with the merger*."

82.    Once FE 1 was let go by the Company in mid-July, just weeks before the Company purportedly expected to close the Merger, FE 1 wondered why MaxLinear would discharge its top compliance professional just before merging with a foreign company whose contracts were in a foreign language and were governed by a complex regulatory environment. Accordingly, FE 1's dismissal from the Company was a clear indication to FE 1 that MaxLinear did not plan to go through with the Merger.

83.    FE 2 similarly recalled a lack of any integration preparation or planning and stated that, after receiving several "red flags" related to MaxLinear's declining business and "really bad forecasts," the Individual Defendants "finally realized they had made a bad choice with wanting to acquire Silicon Motion, so *they tried to minimize their loss by breaking the deal*."

***Materially False and Misleading Statements***

84.    On June 2, 2023, Defendant Litchfield attended a webinar hosted by Roth MKM on behalf of the Company, along with MaxLinear's Investor Relations point person, Leslie Green ("Green"). During the webinar, neither of the Company's representatives mentioned any material adverse effect on Silicon Motion's business. Likewise, neither of the Company's representatives mentioned any material breach of the Merger Agreement by Silicon Motion. In fact, with respect to the Merger, the Company representatives stated that MaxLinear remained very interested in Silicon Motion as an asset. In response to a question regarding the impact of interest rate increases, the Company representatives stated that there were no issues with the deal and that funding was committed. Further, during

closing remarks, Green and Defendant Litchfield represented that MaxLinear was excited about the Merger and that the rationale for the deal was stronger than ever. Specifically regarding the process for securing regulatory approval, the Company representatives stated that SAMR's regulatory approval was the last item needed for the deal to close.

85.    The statements identified above during the Roth MKM webinar were materially false and misleading and omitted to state facts necessary to make the statements not misleading because, at the time of the webinar, the Individual Defendants had already decided not to go through with the Merger. As the Individual Defendants would ultimately reveal at the end of the Relevant Period, "certain conditions in Article 6 of the Merger Agreement ***were not satisfied or waived as of May 5, 2023***," almost one month prior to the webinar.

86.    On June 6, 2023, Defendant Seendripu attended the Stifel Cross Sector insight Conference on behalf of the Company. In response to an analyst question regarding whether the Company remained interested in acquiring Silicon Motion, Defendant Seendripu stated the following:

> Look, we have some conviction [in] what we do. And I don't think we touch anything where our core technology platform doesn't expand us into the adjacent markets, right? And storage is not an adjacent market. Our primary focus [has been] the enterprise market and the data center market, and Silicon Motion is the number one merchant [] controller – storage controller supply in the world. And I don't look at controllers at storage. I look at [it] as data traffic. I look at [it] as how do you improve latency and speed of access and the amount of the memory[.] [T]oday, non-memory is monstrous, right?
>
> [] But the most important thing about the memory is if you look at the storage network is that, speed of access of the data and integrity of the data and throughput. And now it's the excel, it's going to spread all over the place as well. So you need to tightly couple the controllers with accelerators, right? And they all belong together ***and together [with Silicon Motion], we bring the portfolio to make it happen.***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The other part of it is that memory is no longer about moving bits around with [the] controller, right? Talked about data integrity. So it's a lot of encryption technology, signal processing, I/O bandwidths, the mixed-signal IP [is] all common. *So we'll get the, what they call, the technology synergy. And therefore, the R&D synergy [w]e need to, for both the companies combined together.*

So we should be able to have synergies in the OpEx. *We still are very, very, what I call, bullish that we can acquire the synergies that we told you all about.* And yes, the revenues of the combined companies have come down [], but it just delays the, what I call, the benefits of the acquisition accordingly by a year or so. *But the basic rationale has not changed at all. So I believe it's a very strategic asset for the company.*

87.   The following day, the Company filed a Form 425 with the SEC in connection with the Merger, which contained "expected portions of a transcript of the [Stifel Conference] presentation that relate to the Merger."

88.   The Form 425 contained the following false and misleading statements made by Defendant Seendripu at the Stifel Conference:

So we'll get the, what they call the technology synergy and therefore the R&D synergy. We need to, for both the companies combined together.

* * *

We still are very, very what I call bullish, that we can acquire the synergies that we told you all about.

* * *

And yes, the revenues of the combined companies have come down and, but it just delays the, what I call the benefits of the acquisition accordingly by a year or so.

* * *

[T]he basic rationale [for the Merger] has not changed at all. [Silicon

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Motion is] a very strategic asset for the company.

89.    On June 28, 2023, the Company filed a current report on Form 8-K with the SEC (the "June 28, 2023 8-K"). The June 28, 2023 8-K stated the following regarding the Merger:

> As previously disclosed, on May 5, 2022, MaxLinear, Inc., a Delaware corporation ("MaxLinear") entered into an Agreement and Plan of Merger (the "Merger Agreement") with Silicon Motion Technology Corporation, an exempted company with limited liability incorporated under the law of the Cayman Islands ("Silicon Motion") and Shark Merger Sub, an exempted company with limited liability incorporated under the law of the Cayman Islands and a wholly-owned subsidiary of MaxLinear ("Merger Sub"), pursuant to which, on the terms and subject to the conditions set forth therein, Merger Sub will merge with and into Silicon Motion (the "Merger"), with Silicon Motion surviving the Merger as a wholly-owned subsidiary of MaxLinear.

90.    The June 28, 2023 8-K further represented that the completion of the Merger was dependent on certain conditions being met pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"), while failing to disclose that the Individual Defendants had already decided not to go through with the Merger, stating that "[t]he completion of the Merger is conditioned upon, among other things, the expiration or termination of the waiting period applicable to the consummation of the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended."

91.    The June 28, 2023 8-K further stated that "***since the Merger was not consummated by June 27, 2023***, clearance under the HSR Act has expired, and on June 28, 2023, ***MaxLinear and Silicon Motion re-filed under the HSR Act***."

92.    As noted by a Wedbush analyst after the Company announced the termination of the Merger, the "application for [Hart Scott Rodino Act approval] on June 28th" had "impl[ied] everything was still on track as of that date." Similarly, after the termination announcement, an FBN analyst questioned, "if the agreement

was not in force as of [May 5, 2023], why did MXL continue to perform under the agreement by refiling HSR on [June 28, 2023?]"

***The Truth Emerges***

93.     On July 26, 2023, before the market opened, SAMR announced that it had granted regulatory approval for the Merger. Analysts reacted to the announcement, suggesting that, based on repeated representations by the Individual Defendants, the Merger was now expected to close by the August 7, 2023 Outside Date. For instance, analysts at Wedbush issued a "Quick Note" on July 26, 2023, stating that SAMR approval "would seem to clear the way for the deal to be consummated ahead of the August deal expiration date" and that "we now believe the transaction is on track to be completed." Similarly, analysts at Wells Fargo stated that SAMR approval "pav[ed] the way for a final close ahead of the Aug[.] 7 merger agreement exp[iration]."

94.     Hours later, the Individual Defendants announced that the Company was unilaterally terminating the Merger. At 3:10 PM on July 26, 2023, MaxLinear issued a press release (the "Termination Announcement"), which claimed that the Company was terminating the Merger because: (i) Silicon Motion failed to satisfy unspecified "conditions" of the Merger; (ii) an unspecified development had a material adverse effect on Silicon Motion's business; and (iii) Silicon Motion had committed unspecified "breaches" of the Merger Agreement. In the press release, the Company claimed that these events had occurred "as of May 5, 2023," despite the Individual Defendants' repeated assurances after that date that they fully expected successful completion of the Merger. The Termination Announcement stated the following:

> ***Following [the] regulatory approval***, on July 26, 2023, MaxLinear provided notice to Silicon Motion that it has terminated the Merger Agreement and MaxLinear is relieved of its obligation to close because, among other reasons, (i) certain conditions to closing set forth in the Merger Agreement are not satisfied and are incapable of being satisfied,

(ii) Silicon Motion has suffered a Material Adverse Effect that is continuing, (iii) Silicon Motion is in material breach of representations, warranties, covenants, and agreements in the Merger Agreement that give rise to the right of the Company to terminate, and (iv) in any event, the First Extended Outside Date has passed and was not automatically extended because certain conditions in Article 6 of the Merger Agreement were **not satisfied or waived as of May 5, 2023**.

95.    During a conference call, hosted by the Company on the same day, Defendant Litchfield stated the following: "As you saw from our press release, we have exercised our contractual right to terminate the merger agreement. Please note that we do not intend to share any further detail on this matter at this time, and our call today will be focused on our quarterly results."

96.    On this news, the price of MaxLinear stock declined a staggering 33.6% over the following two days, from a close of $34.00 on July 25, 2024 to a close of $22.55 on July 27, 2023.

***Post-Relevant Period Events***

97.    On July 27, 2023, Silicon Motion issued a press release, refuting the statements contained in the Termination Announcement:

> ***In the 15 months since the signing of the merger agreement between the parties, Silicon Motion worked cooperatively with MaxLinear to obtain regulatory approvals for the merger, Silicon Motion complied with its obligations under the agreement and Silicon Motion has not suffered a material adverse effect*** … Silicon Motion ***expects MaxLinear to abide by its obligation under the merger agreement*** and intends to vigorously enforce its rights under the merger agreement.

98.    Analysts responded swiftly to the news, with many questioning whether the Individual Defendants had disclosed the full truth with respect to the termination of the Merger. For instance, on July 27, 2023, FBN Securities issued a report, which stated that the Company's "***termination falling so closely on the heels of the SAMR approval suggests buyer's remorse***," rather than the reasons

stated in the Termination Announcement, as the true impetus for backing out of the Merger. The FBN Securities report went on to candidly state that the Company "*recognized that its cleanest way out in . . . a deal it no longer wanted was SAMR*."

99.     On August 14, 2023, in a podcast published on SeekingAlpha, Focus Capital similarly concluded that a "downturn" in both MaxLinear's business and the semiconductor industry, in conjunction with "the huge rise in interest rates," caused the Company to suffer from "buyer's remorse." Focus Capital continued, suggesting that the Company must have questioned whether it could "even afford [the Merger]" before reasoning, "Let's just take a Hail Mary and try and get out of this thing."

100.     Meanwhile, on August 7, 2023, Silicon Motion issued a press release "categorically reject[ing] MaxLinear's purported termination of the Merger Agreement, and the assertions made by MaxLinear, in its letter of July 26, 2023." Silicon Motion attached a letter to its press release, which explained that MaxLinear failed to provide notice of the purported grounds for termination, as mandated by the Merger Agreement, "in the nearly fifteen months since the parties signed the Agreement."

101.     On August 16, 2023, after MaxLinear failed to consummate the Merger by the August 7, 2023 Outside Date, Silicon Motion issued a press release, stating that it considered the Merger Agreement terminated and would pursue substantial damages from MaxLinear "well in excess" of the termination fee. Silicon Motion further stated in the press release that it intended to commence an arbitration against MaxLinear in the Singapore International Arbitration Centre ("SIAC").

/ / /

/ / /

/ / /

/ / /

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

102.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

103.    MaxLinear is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

104.    Plaintiff is a current shareholder of MaxLinear and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

105.    A pre-suit demand on the Board of MaxLinear is futile and, therefore, excused.  At the time this action was commenced, the eight-member Board was comprised of Defendants Seendripu, Pardun, Artusi, Beaver, Dougherty, Liu, Moyer, and Tewksbury (the "Director Defendants"). Accordingly, Plaintiff is only required to show that four Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

106.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

107.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

108.   Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

109.   Defendant Seendripu is not disinterested or independent and is therefore incapable of considering a demand. Defendant Seendripu co-founded the Company and serves as its President and CEO. Accordingly, the Company admits that Defendant Seendripu is a non-independent director.

110.   Furthermore, Defendant Seendripu is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Actions based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

111.   Defendants Beaver, Moyer, Pardun, and Tewksbury serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Merger as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

112.   The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

113.   All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Specifically, none of the Board's current members have taken remedial action to redress the conduct alleged herein. For instance, none of the Board's current members have sought to enforce MaxLinear's Clawback Policy, which provides:

> To the extent permitted by applicable law, the Clawback Policy requires our executive officers to repay to MaxLinear certain recoverable incentive compensation if (i) we are required to prepare an accounting restatement of our financial statements as a result of a material noncompliance with any financial reporting requirement under securities laws, including any required accounting restatement to correct an error in previously issued financial statements that is material to the previously issued financial statements, or that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period, or an Accounting Restatement; (ii) the amount of cash incentive compensation or performance-based equity compensation, in each case, that was paid or is payable based, in whole or in part, on the achievement of specific financial results of the company paid to a participant would have been less if the financial statements had been correct at the time such compensation was

originally determined; and (iii) such compensation was paid during the three completed fiscal years immediately preceding the earliest to occur of the date our board or our compensation committee concludes, or reasonably should have concluded, that the company is required to prepare an Accounting Restatement, or a court, regulator or other legally authorized body directs the company to prepare an Accounting Restatement.

114. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

115. The acts complained of herein constitute violations of fiduciary duties owed by MaxLinear's officers and directors, and these acts are incapable of ratification.

116. The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of MaxLinear. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of MaxLinear, there would be no directors' and officers' insurance protection.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

117. If there is no directors' and officers' liability insurance, then the directors will not cause MaxLinear to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

118. Thus, for all of the reasons set forth above, all of MaxLinear's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for
### Breach of Fiduciary Duty

119. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

121. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

122. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting

issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

123.   As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

124.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Actions, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital.  In addition, as a result of the Individual Defendants' misconduct, the Company will incur significant costs and expenses to defend itself in any action for damages by Silicon Motion, which stated it pursue damages "well in excess" of the Merger termination fee.  The Company will incur additional costs and expenses to defend itself in any SIAC arbitration proceeding initiated by Silicon Motion. Finally, the Company has sustained substantial reputational harm from the wrongful termination of the Merger.

## COUNT II

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

125.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual

Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

127.   Plaintiff on behalf of MaxLinear has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

128.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MaxLinear.

130.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from MaxLinear that were tied to the performance or artificially inflated valuation of MaxLinear, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

131.   Plaintiff, as a shareholder and a representative of MaxLinear, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

132.   Plaintiff on behalf of MaxLinear has no adequate remedy at law.

/ / /

/ / /

/ / /

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT IV

### Against the Individual Defendants for
### Abuse of Control

133.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.  The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

135.  As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

136.  Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for
### Gross Mismanagement

137.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.  The Individual Defendants, either directly or through aiding and abetting, failed to reasonably exercise their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the expectations and operations of a publicly held corporation.

139.  As a direct and proximate result of the Individual Defendants' gross mismanagement alleged herein, the Company has sustained and will continue to sustain substantial damages.

140.  Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for
### Waste of Corporate Assets

141.  Plaintiff incorporates by reference and realleges each and every

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

allegation contained above, as though fully set forth herein.

142.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

143.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Actions, and defending itself in any action for damages and/or in any SIAC arbitration proceeding initiated by Silicon Motion.

144.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

145.   Plaintiff on behalf MaxLinear has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.     Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.     Awarding punitive damages;

D.     Awarding costs and disbursements of this action, including reasonable

attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 12, 2025

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:      */s/ Alex J. Tramontano*
ALEX J. TRAMONTANO

Betsy C. Manifold (182450)
Rachele R. Byrd (190634)
Alex J. Tramontano (276666)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
Email: manifold@whafh.com
Email: byrd@whafh.com
Email: tramontano@whafh.com

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard,
Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Telephone:  267-507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION OF JOSHUA M. STEFFENS

I, Joshua M. Steffens, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____2/7/2025_____

_____
Joshua M. Steffens